The Chancellor.
William Smith died in 1823, leaving considerable real and personal estate. The real estate consisted of what may be designated tbe homestead farm, of about ninety-six acres; the Sherman farm, of sixty-seven aeres; the Bonham lot, of eight and a half acres; *378 and the Waterhouse lot, of six acres. He left his wife surviving him, and three children; a son, Asa, and two daughters, Amy, who was single, and Elizabeth, wife of Jonathan Sutton. He left a will, and by it, made the following disposition of his real estate. He gives to his wife and to his son Asa the use of the homestead, until it should be sold by his executors. The Sherman farm and the Bonham farm he authorizes his executors to sell as soon after his decease as they might think proper, and, from the money thence arising, to discharge his debts and the legacies of his will, and whatever should remain over a thousand dollars, to divide equally between his wife and three children, except his daughter Elizabeth Sutton’s share, which the executors were to retain until her marriage was dissolved. If she was living when that event happened, she was to receive her share. In case of her death, her husband surviving her, the executors w;ere to pay it to her children. The testator then directs that, as soon after the expiration of six years from the time of his decease as his executors should think proper, they . should sell all the residue of his estate, consisting of his homestead farm with all such lots of land as might then belong to his estate,' and the money thence arising to be divided into four shares, one for his wife, one for his son Asa, one for the use of his daughter Elizabeth, and one for his daughter Amy. The testator gave a legacy of two hundred dollars to his grandson, and appropriated the interest of one thousand dollars to be paid yearly to his wife, for her support. These legacies were charged on the Sherman and Bonham farms. Upon the death of his wife, the testator directed that all the property given to her, or for her use, including the thousand dollars, should be equally divided between his three children.
In March, 1829, following the expiration of the period after which the executors were authorized to sell the homestead farm, the executors had not exercised the discretion given them by the will to sell any of the real *379 estate of the testator. It had not been necessary for them to do so. The personal estate had paid all the debts, and also the annuity to the widow, up to that time; and there was left in the hands of the executor, undisposed of, the sum of eight hundred and eight dollars and seventy cents.
This being the situation of the estate, and no one being interested in it but the three children and their mother, they considered that it was for their mutual advantage, instead of having the real estate sold by the executors for the sole purpose of distributing among them the proceeds of such sale, to divide the real estate itself among themselves, in such proportions as they deemed just in reference to their respective interest in ■ the proceeds, agreeably to the provisions of the testator’s will. They did accordingly, on the 11th of March, 1829, enter into an agreement, under their respective seals, by which, after reciting so much of the will of the testator as explained the object they had in view, they agreed to divide all the real estate as follows: The widow and two daughters were to release to Asa Smith all their right and title in the Sherman and Bonham farms, and Asa agreed to release to his mother and sisters all the residue of the real estate, subject to the payment of sixty dollars a year to the mother during her life, and at her death the same to be the property of the sisters free of all encumbrances. This agreement was fully carried out by all the parties to it. Shortly after it was entered into, Amy Smith married. She, with her husband, her mother, and sister, executed the necessary releases to Asa Smith, and Asa and his wife executed appropriate releases on their part. They entered into the possession of their respective portions according to the division, and after quietly enjoying such possession for a number of years, and while in possession, Elizabeth, Amy, and Asa Smith died, all of them, up to the time of their decease, satisfied with the family arrangement that had been made, and unmolested in their possession by any one claiming the right to interfere with it. Amy *380 Smith was married to Jonathan O. Stout, who is one of the defendants in this suit. They had one child, Mary, who married William Scudder. They are the complainants in this suit. We come now to their cause of complaint.
On the 11th of April, 1840, the executors sold all that part of the real estate which, in the arrangement and division, was set off and released hy Asa Smith to his mother and sisters. The hill charges that the sale was made at the instigation of Jonathan O. Stout, for the purpose of getting that portion of the real estate which belonged to his wife converted into personalty, and obtaining the money as her administrator. It charges that he frequently urged his wife, during her life, to sell her estate, which she always refused to do, and that, after her death, he induced the executors to make the sale under the authority of their testator’s will. It charges that the executors fraudulently connived with Stout to enable him to accomplish his purpose, and, also, that the purchasers, who are defendants in the suit, were cognizant of the fraud, and purchased with full knowledge of all the facts. The bill prays^ that the sale may he declared void, and may he set aside, so far as respects the interest of Mary Scudder, and that she may he decreed entitled to one half of the said real estate sold hy the executors, subject to her father’s interest as tenant hy the curtesy; or, if more equitable, that she may he declared entitled to the proceeds of the sale, as representing the land, subject to her father’s right to the interest during his. life, hy reason of his marital rights.
I have no hesitation in declaring that this sale was not made bona fide hy the executors. The sale was a breach of trust, and grossly fraudulent in its consequences as to the rights and interest of Mary Scudder, who was then an infant under ten years of age.
Look at the consequences of this sale upon the rights of the parties interested. The Sherman farm and Bonham *381 lot were charged by the testator with the thousand dollar fund, which was created by the testator for the purpose of securing ■ the annuity to the widow. The executors were directed to sell them for that purpose. They were amply sufficient to secure the object for which the testator had designated them. These lands, in the family arrangement, were released to Asa Smith. The executors never disturbed him in his possession. They permitted him to enjoy the full advantage of the agreement. He became insolvent, and the lands were sold as his, by due course of law, for the benefit of his creditors. The executors then sold the lands, which Asa had released to his sisters, and paid over to his administrator one-third of the proceeds of the sale. Thus Asa got not only the two' tracts of land released to him, which was all he was entitled to, but one-third of the proceeds of the residue of the testator’s real estate. This was a fraud. It was produced by the conduct of the executors. Their proceeding cannot be justified upon any considerations which appear in the case as it is presented.
The executors are not here to answer for themselves. Let us see what plea their representatives interpose to justify the course they pursued.
They deny that the sale was made at the instigation of Stout, or upon any fraudulent combination with Stout. This allegation of the bill is not sustained by proof, but the history of the case shows that there was ground for the charge. But the defendants, as the main ground to justify the executors, say, that the family agreement, and the releases to carry it into effect, were not valid in law, because, at the time of their execution, Elizabeth Sutton was a feme covert. It is not denied that if the parties were capable of contracting, the agreement was lawful and valid. When the testator directs a sale of land to be made, and the proceeds to be divided among his heirs at law, they may elect to take the lands, and a court of equity will secure to them the benefits of that election. Rinehart *382 and Wife v. Harrison’s Executors, 1 Bald. 179; Gest v. Flock et al., 1 Green’s Ch. Rep. 115; Amler v. Amler, 3 Ves. 583.
The plea, that the agreement was not legal because Elizabeth Sutton was a feme covert, comes with an ill grace as a defence on the part of the executors. One of the executors drew up the agreement. It is produced, and proved to be in his handwriting. The parties lived ten years under this agreement. They died under it, undisturbed by these executors. Third parties had, by due course of law, acquired rights under it. The ownership of the property had become so changed that the agreement could not be disturbed without grossly violating the rights of some of the parties to it, and fraudulently depriving them of their property. The executors had acquiesced in the agreement, and by their conduct had induced such a state of things as made it a fraud in them to disturb it. Admit the agreement was not valid for the reason alleged. No party, who had a right so to do, had questioned it; and these executors could not be made responsible to any one for any delinquency. It is pretended they were responsible to the widow for her annuity. But this is a mere pretence. As she was a party to the agreement, and by it had relinquished her claim upon the executors, under no circumstances could she make them responsible.
"Was the agreement invalid? At the time of its execution, Mrs. Sutton’s husband had been absent six years and upwards. The report was that he was dead. It was so considered by the family. "When the executors sold, Mrs. Sutton had been married a second time. Sutton had then been absent sixteen years. At that time no court of law or equity would have disturbed the agreement on the ground alleged. The executors were not justified in selling the property on this ground; and such an excuse, under the circumstances of this case, can be considered only as a mere pretence. I am bound to say, from the facts before me, that the executors acted fraudulently in selling *383 the property, for no good reason is given, nor do I see that any can be suggested, for their making the sale.
But although the executors acted in bad faith, and in violation of the rights of those interested in the will of the testator, it does not follow, as a consequence of their fraud, that the sale made by them is void. The executors were authorized by the will to sell the land. Their grantees were not bound to know of the agreement made by those who were interested in the lands to be sold, or to make inquiry for any other disposition of the land than such as the executors, by the will, were authorized to make. The record was not notice to them of the agreement. The bill charges that they were cognizant of all the facts. This is not proved. It is true the defendants have not put in any answer denying the charge. It does not follow that because they have not answered, a decree pro confesso must necessarily be taken against them. The court may direct, when the defendants have not answered, a decree pro confesso, or order the complainants to make proof of their case. Other defendants, against whom charges were made which, if true, involved such knowledge on the part of the grantees, have denied such charges. The complainants have attempted to make the proof, and have failed. These grantees stand before the court as innocent parties, and they are in a position not necessarily involving them in the consequences of a fraud committed by others. 1 do not think the case is such as will warrant an interference with the title of the grantees of the executors.
It remains to determine whether the complainant is entitled to any relief; and if so, what that relief is. The mother of the complainant, Mary Scudder, was entitled, under the will of her father, to one-third of all the proceeds of his real estate, subject to certain encumbrances imposed by the testator. She made an election, in a manner which by law she had a right to do, by which she became entitled, with her sister, to one moiety of the home *384 stead farm. She, her sister, and her brother, were seized in fee of this land as the heirs at law of their father, and their brother released to them, thus making the two tenants in common. While thus seized, Amy Smith married the complainant, Stout, who with her, and in her right, entered into possession of the land. Stout and his wife were in possession under the family arrangement and agreement. While thus seized, his wife died, leaving the complainant, Mary Scudder, then an infant of tender years, her heir at law. Stout thus became tenant by the curtesy. The executors then sold the land. Stout took out letters of administration upon his wife’s estate, and, as administrator, claims one-third of the proceeds of the sale. On behalf of the complainants, it is insisted that one half of the land sold by the executors belonged to Mary Scudder, as the heir of her mother, and that the executors should be declared trustees holding the proceeds for her benefit, subject to remuneration to her father out of the same for interest in the lands, as tenant by the curtesy.
It appears to me that the rights of the parties turn upon the proper answer to the single question, was Amy Stout, when she died, legally entitled to one half of the homestead farm under the agreement she had entered into with her brother and sister, or was she entitled in no other right than under the will of her father, and only to one-third of the proceeds after the sale of it by the executors ? I have already expressed the opinion that the agreement was a valid and a legal agreement. If so, one half of the farm was hers. When she died, it descended to her daughter, as her heir at law. If the executors have sold it wrongfully, and this court cannot redress the injured party by restoring the land, it is equitable that the proceeds of that sale should be secured to her. This court will restore her to her rights, as far as it is able. She was entitled to one half of the land, subject to the right by the curtesy of her father, and the same interest should be secured to her in the proceeds. The defendants say, that one-third of these, *385 proceeds have been paid over to the personal representative of Asa Smith. If so, such payment was wrongfully made. The executors knew that Asa Smith had received from his sisters all his interest in the real estate of his father, and that, by his deed, he had conveyed to his sisters all his interest in the homestead farm. He was not entitled to any of the proceeds. He had a perfect right to convey his interest to his sisters. The executors, with a knowledge of the fact that he had done so, had no more right to pay any of the proceeds to his personal representative than they had to make such payment to a perfect stranger. It was a fraud for them to do so.
The complainants are entitled to an account for one half of the proceeds of the homestead farm, deducting the one-sixth of the one thousand dollars paid to the representatives of Asa Smith, deceased, and to have the money brought into court, to abide its further directions as to the disposition of the fund.